IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GLES, INC.,<br><br>                    Plaintiff,<br><br>     v.<br><br>MK REAL ESTATE DEVELOPER &<br>TRADE COMPANY, et al.,<br><br>                    Defendants. | Civil No. 08-1447 (KMW) |

## MEMORANDUM OF DECISION

This Memorandum of Decision serves as the Court's Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52 in connection with the parties' non-jury trial which occurred on January 10, 2011 and January 11, 2011.  Pursuant to 28 U.S.C. §636(c), the parties consented to the jurisdiction of this Court to preside over the trial.  Mark Greco, Michael Butler and Kevin Krowicki testified on behalf of Plaintiff, GLeS, Inc. f/t/a Sweet Oil Company.  Maninder Kohli and Hermeet Kohli testified as, and on behalf of, Defendants.

Plaintiff, GLeS, Inc. f/t/a Sweet Oil Company ("GLeS"), a Delaware Corporation with a principal place of business in Turnersville, New Jersey, brought this action against MK Real Estate Developer & Trade Company ("MK Real Estate"), Maninder Kohli and Hermeet Kohli , husband and wife, for breach of contract.  For many years, the parties had a business relationship whereby

1

Plaintiff provided Defendants with fuel to operate its retail gasoline businesses.  In or about 2005, the agreement between the parties expanded to include the branding of two (2) of Defendants' retail gasoline stations-the Swedesboro station and Pole Tavern station.  By virtue of this lawsuit, Plaintiff is seeking to recover past due payments in the amount of $80,780.20 for six (6) fuel invoices and $71,306.02 for costs related to re-branding the Defendants' gas stations.  Plaintiff also seeks interest, attorneys fees and costs.  Defendants' Counterclaim for breach of contract relates to Plaintiff's alleged failure to pay branding incentives in the amount of $60,000 plus a two cent (.02) per gallon rebate in the amount of $147,563 for gasoline purchased by MK Real Estate. The case proceeded to trial on the merits in January 2011 and the parties submitted post-trial proposed Findings of Fact and Conclusions of Law.  For the reasons that follow, the Court finds in favor of GLeS, with exceptions, on its breach of contract claim. The Court finds for Plaintiff on Defendants' Counterclaim.

I. **Findings of Fact**

   **A. Background**

   1.  Plaintiff, GLeS[1], is a Delaware corporation that

---

[1] GLeS, Inc. f/t/a Sweet Oil Company sold its Company in March 2007.  For the relevant time period, Sweet Oil was the contracting party with MK Real Estate.

distributes major brand gasoline. (Stip. Facts[2] ¶ 1; Tr. 9).

2. MK Real Estate is a New Jersey corporation (Stip. Facts ¶2) and Maninder and Hermeet Kohli, husband and wife, are the owners. (Trial Tr. 192, Jan. 10, 2011).

3. Defendants have been in the retail gasoline business for twenty-four (24) years. (Stip. Facts ¶11).

4. Plaintiff and Defendants first had a business relationship whereby Plaintiff provided fuel to Defendants beginning around 2000 or 2001 at other stations operated by Defendants. (Stip. Facts ¶12).

5. On or about December 1, 2005, GLeS and MK Real Estate entered into a Sales Agreement ("Agreement"). (Exh. J3).

6. Maninder and Hermeet Kohli personally guaranteed the Agreement on behalf of MK Real Estate. (Stip. Facts ¶7).

7. On December 1, 2005, the parties also executed a "Termination Agreement" to end their prior contractual obligations. (Trial Tr. 2, 20, Jan. 11, 2011).

**B. Fuel Invoices**

8. On January 10, 2011, at the commencement of the trial, Defendants stipulated to the fuel invoices in the amount of $80,780.20.[3] (Trial Tr. 5-7).

---

[2]The stipulated facts are derived from the Stipulation of Facts found in section three of the Revised Joint Final Pretrial Order entered on November 8, 2010.

[3]However, Defendants maintain that they are entitled to offsets based on their counterclaim.

9.   On or about February 20, 2007, Defendants received fuel product valued at $17,374.61 from Plaintiff, received invoice number 624184 for the fuel product, and did not pay the invoice. (Stip. Facts ¶12; Exh. P1).  This invoice was initially presented to Defendants in February of 2007.  (Trial Tr. 25-26).

10. On or about March 3, 2007, Defendants received fuel product valued at $6,535.26 from Plaintiff, received invoice number 157061 for the fuel product, and did not pay the invoice. (Stip. Facts ¶13; Exh. P3).  Plaintiff first presented this invoice to Defendants at the end of June 2007.  (Trial Tr. 72).

11. On or about September 19, 2006, Defendants received fuel product valued at $17,703.73 from Plaintiff and Plaintiff sought payment by way of bank draft for invoice number 582165.  On February 23, 2007, the draft was returned unpaid. (Stip. Facts ¶15; Exh. P5).  Plaintiff first presented this invoice to Defendants in February 2007.  (Trial Tr. 65).

12. On or about March 1, 2007, Defendants received fuel product valued at $19,606.44 from Plaintiff, received invoice number 6278443 for the fuel product, and did not pay the invoice. (Exh. P7).  Plaintiff first presented this invoice to Defendants in August 2007.  (Trial Tr. 71).

13.   On or about March 3, 2007, Defendants received fuel product valued at $21,250.49 from Plaintiff, received invoice number 627978 for the fuel product, and did not pay the invoice.

(Exh. P9).  Plaintiff first presented this invoice to Defendants in August 2007.  (Trial Tr. 72).

14.   On or about March 5, 2007, Defendants received fuel product valued at $7,682.45 from Plaintiff, received invoice number 157234B for the fuel product, and did not pay the invoice. (Exh. P11).  Plaintiff first presented this invoice to Defendants at the end of June 2007.  (Trial Tr. 72).

15. The six fuel invoices were admitted as accurate and owed by Defendants. (Trial Tr. 3-4, 5).

16.  The six (6) invoices for fuel were never paid by the Defendants and have yet to be paid.  Pursuant to the Agreement, Mark Greco would bill the fuel received by Defendants from the oil companies either electronically or by fax.  The six (6) invoices were billed electronically, faxed to Defendants and even hand-delivered to Defendants. (Trial Tr. 25-26).

17.  Plaintiff also paid the taxes associated with the sale of gallons of gasoline to Defendants. (Trial Tr. 17).

18.  In addition to receiving a bill from the Plaintiff, Defendants would also receive a copy of the bill of laden from their own driver of the fuel delivery truck, Lee Transports. (Trial Tr. 27).

19. The six (6) invoices for fuel were presented to Defendants many times for payment by the Plaintiff. (Trial Tr. 31; Trial Tr. 153-158).

5

20. Pursuant to the Agreement, if the Defendants disputed a fuel invoice, they were required to notify the Plaintiff of their dispute in writing within 30 days of their receipt of the invoice. (Exh. J3). The Defendants never notified the Plaintiff, in writing or otherwise, of any dispute with any of the invoices. (Exh. J3 ¶4(g); Stip. Facts ¶16; Trial Tr. 31, 46-47).

21. The Agreement indicates that Defendants' failure to dispute the invoices in writing is an admission that the invoices are correct. (Exh. J3).

**C. Branding**

22. The "Addendum to Sales Agreement" ("Addendum") contained on page 26 of 26 of the Agreement provides that Defendants:

> will receive from BP $30,000.00 per site for branding incentives, plus 2 cents per gallon of gasoline purchased for the first 36 months of the Sales Agreement (to be paid as per BP's JOIP program). (Stip. Facts ¶25).

23. Defendants were not provided with a written document which outlined the requirements of the JOIP program. (Trial Tr. 169).

24. Paragraph 7 of the Addendum requires the Defendants to pay for all materials to be used for the re-branding and for the Plaintiff to supply all labor to install the branding materials. (Exh. J3).

25. Plaintiff was responsible for ordering the branding

materials and installing the materials.  (Trial Tr. 35-36).

26. The first branding bill in the amount of $2080.00 was for removal of poles and installation of cladding.  (Exh. P13).  This invoice was billed by Plaintiff to the Defendants but was never paid.  (Exh. P13; Trial Tr. 36-37).  This invoice is for labor, albeit labor performed by Ariel Signs, a company hired by Plaintiff, but labor nonetheless.  (Trial Tr. 80).

27. The second branding bill in the amount of $2428.00 was for welding new plates on poles and installation of poles.  (Exh. P14). The bill was submitted to the Defendants and has yet to be paid. (Ex. P14; Trial Tr. 37-38).  This invoice is also for labor performed by Ariel Signs.  (Trial Tr. 80).

28. The third branding bill in the amount of $23,699.79 was for various branding materials for BP signage and decaling.  This bill was submitted to Defendants and has yet to be paid. (Exh. P15; Trial Tr. 38-39).  However, Plaintiff failed to accurately establish when this invoice was first presented to Defendants for payment.  (Trial Tr. 73-77).  This invoice is deemed presented to Defendants for payment in August of 2007.  (Trial Tr. 73-77).

29. The fourth branding invoice in the amount of $8295.53 was for BP re-imaging materials for the Swedesboro location on Route 322.  These materials were billed to Defendants and have yet to be paid. (Exh. P16; Trial Tr. 40).  This invoice was first presented to Defendants in July 2006.  (Trial Tr. 77).

7

30. The last branding invoice totaled $34,801.80 for BP branding items. (Exh. P17). Plaintiff does not know whether or not they attempted to collect on this invoice. (Trial Tr. 78). This invoice is deemed first presented to Defendants in August 2007. (Trial Tr. 78).

31. All of the branding invoices were billed to the Defendants and have yet to be paid. (Trial Tr. 41; Stip. Facts ¶23).

32. Plaintiff supplied labor related to the installation of branding items for the two gas stations. Most of the labor was performed by employee Kevin Krowicki and other labor was performed by Ariel. (Trial Tr. 59-60).

33. Three of the five branding invoices represent branding materials that were paid for by the Plaintiff and not reimbursed by the Defendants. (Exh. J3 ¶7; Trial Tr. 59-60).

34. The total amount paid directly by Plaintiff for branding costs for Defendants' stations is $66,797.10[4]. (Stip. Fact ¶19).

35. Defendants acknowledge receiving the invoices for branding costs totaling $71,306.02. (Stip. Facts ¶20).

36. Defendants have never provided Plaintiff written or verbal notice that they dispute any of the invoices generated by Plaintiff for branding materials. (Stip. Facts ¶¶21,22).

**D. Defendants' Counterclaim**

---

[4]The amount does not include the two branding invoices which the Court has determined were for labor.

37.  The Addendum provides that "[p]urchaser will re-brand the Swedesboro Mobil & Pole Tavern Mobil locations to BP effective January 1, 2006, thus, the Agreement is clear, on its face, that Defendants were responsible for re-branding their station.  (Exh. J3 at 26, ¶2).

38.  If the Defendants met the image requirements as established by BP as the national franchise whose ''brand'' the Defendants were to represent, Branding Incentives would entitle the Defendants to $30,000 for each of the two stations being re-branded and a $.02 cent per gallon rebate of all gallons of gasoline sold during the first 36 months of the agreement. (Stip. Facts ¶24).

39.  Defendants were required to obtain full branding to qualify for the branding incentives but could only do so through Plaintiff because only Plaintiff had the ability to order branding materials from BP.  (Trial Tr. 35; 200-201).

40.  The Defendants understood that the rebate would be paid to them by BP. (Addendum; Trial Tr. 2, 6-7).

41.  The Defendants' gas stations were never fully branded BP gas stations because a number of BP required identifiers, including point of sales material on the top of the dispenser, the curb painting, canopy lighting, uniforms, and the deficiencies cited by the mystery shopper, were never completed and/or installed at the stations. (Trial Tr.2, 53-54; 59).

42.   Mr. Butler discussed with Defendants the branding

deficiencies that existed at the stations numerous times and told them of the things that would have to be completed to qualify for the branding monies. (Trial Tr. 2, 56).

43.    Kevin  Krowicki  was  Plaintiff's  Maintenance  Tech responsible for branding for Plaintiff. (Trial Tr. 2, 58).  Mr. Krowicki was responsible for converting a location from one brand to  another.   (Trial  Tr.  11).   Plaintiff  sent  Mr.  Krowicki  to Defendants'  gas  stations  to  compile  a  specific  list  of  materials that  would  need  to  be  ordered  through  BP  suppliers  in  order  to convert the locations. (Trial Tr. 19).  Mr. Krowicki worked for 2-3 weeks on branding the stations but notes the same deficiencies that existed in branding as noted by Mr. Butler. (Trial Tr. 2, 61). Specifically, the stations did not comply with the BP image because there were no valances, the Helios sign was incomplete and, thus, customers were unable to identify the station as a BP station. (Trial Tr. 2, 60).

44.   During the same time that the Kohlis were re-branding, they were also upgrading pump equipment.  A dispute arose between the Kohlis and the pump supplier which led to the pump supplier not supplying pump valances.  Consequently, the BP logo could not be installed.  (Trial Tr. 20-21; 129-130).

45.  Defendants' two gas stations were never fully branded as BP stations.  (Trial Tr. 19; 52; 201-203).

46.  Defendants  confuse  the  initial  site  approval  by  Frank

Gagnon of BP with the requirements of full branding.  (Trial Tr. 21; 201-202).

47.  In July and August of 2007, each of the two gas stations changed from BP to Exxon due to Defendants' commingling of fuels. (Trial Tr. 2, 14-16).  Consequently, Defendants would have been obligated to repay any branding incentives received from BP. (Trial Tr., 132; Exh. J3).

48.  Defendants paid Monridge Construction Company ("Monridge") $34,250 to install new gas pumps at its Pole Tavern station and $33,960 to install gas pumps at its Swedesboro station. (Exh. D10).

49. The work done by Monridge on piping, the concrete/blacktop and installing/replacing pumps was not branding specific work. Indeed, Defendants continue to utilize the equipment installed by Monridge at their existing stations. (Trial Tr. 129, 135; Trial Tr. 2, 16-17).

**II. <u>CONCLUSIONS OF LAW</u>**

A. Plaintiff's Claims

    1.  Breach of Contract

Under Delaware law, to prevail on a breach of contract claim a plaintiff must show: "(1) the presence of a contractual obligation, whether expressed or implied; (2) breach of that obligation by the defendant; and (3) resulting damages to the plaintiff."  <u>Dynamis Therapeutics, Inc. V. Alberto-Culver</u>

International, Inc., No. 09-773, 2010 WL 3834405 at *2 (D. Del. September 24, 2010)(citing Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC, 2010 Del. Ch. LEXIS 22 at *43 (Del. Ch. Jan. 27, 2010)).  The plaintiff must prove its claim by a preponderance of the evidence.  See Vila v. Bvwebties LLC, No. 4308, 2010 WL 3866098 at *10 (Del. Ch. Oct. 1, 2010); see also Estate of Osborn v. Kemp, No. 3171, 2009 WL 2586783 at *4 (Del. Ch. Aug. 20, 2009)(noting that the court evaluates claims in a post-trial opinion using a preponderance of the evidence standard).

Preliminarily, it is undisputed that the Sales Agreement dated December 1, 2005 is a binding and valid contract entered into between the parties.  Further, based on the facts before the Court, Defendants have breached the Agreement with regard to both the fuel charges and the branding costs.  With regard to the fuel charges, Defendants have stipulated that the fuel charges are owed in the amount of $80,780.20[5], however, they have not paid the fuel charges notwithstanding the fact that the Agreement imposes an obligation to do so.  As such, Defendants are in breach of their obligations pursuant to the Agreement and, as a result of their failure to pay, Plaintiff has been damaged.

Defendants have also breached the Agreement with regard to the costs of the branding materials.  The Addendum to the Agreement

---

[5]This figure represents the total amount of the six fuel invoices which remain unpaid by Defendants less a $9,372.78 credit owed to Defendants by Plaintiff.

provides that "Defendants will pay for all materials to be used in re-branding the 2 Mobil sites to BP." Further, the Addendum also provides "Plaintiff will supply all labor to install branding." The Court finds that Defendants have received invoices totaling $66,797.10[6] representing materials necessary to re-brand their gas stations and Defendants have not paid the invoices despite their express contractual obligation to do so. As a result, Plaintiff has been damaged.

Moreover, while it is undisputed that Plaintiff delayed sending invoices, the Court finds that this delay cannot be construed as Plaintiff's breach of the implied covenant of good faith and fair dealing thereby relieving Defendants of their contractual obligations. Under common law and Delaware's Uniform Commercial Code, every contract imposes an obligation of good faith and fair dealing in its performance and enforcement. See 6 Del. C. §1-304; see also Chamison v. Healthtrust, Inc., 735 A.2d 912, 920 (Del. Ch. 1999). "'One generally cannot base a claim for breach of implied covenant on conduct authorized by the agreement.'" Nemec v. Shrader, 991 A.2d 1120, 1125-1126 (Del. 2010)(citing Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 441 (Del. 2005). Courts will only "imply contract terms when the party asserting the

---

[6]The Court finds that the branding invoices dated February 9, 2006 and January 1, 2007 were not for materials but for labor. Both invoices were for work performed by Ariel Signs to prepare the structure at the locations to accept the BP signage as opposed to actual BP material. As such, Defendants are not responsible for these two invoices.

implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected."  See Nemec v. Shrader, 991 A.2d 1120, 1126 (Del. 2010); see also R.M. Williams Co., Inc. v. Frabizzio, No. 90C-MY-10, 1993 WL 54423 at *8 (Del. Super. Feb. 8, 1993)("The covenant of good faith and fair dealing 'requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract.'"); Chamison, 735 A.2d at 921 (Del. Ch. 1999)("implied covenant is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain.").  When a breach of the implied covenant is claimed, the court, in its analysis, assesses "the parties' reasonable expectations at the time of contracting" as opposed to rewriting "the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal."  See Nemec v. Shrader, 991 A.2d at 1126.  "Parties have the right to enter into good and bad contracts, the law enforces both."  See Nemec v. Shrader, 991 A.2d at 1126.

Here, Plaintiff did not breach the implied covenant on account of their delay in sending the invoices.  With regard to the delayed

14

fuel invoices, it is undisputed that Plaintiff was in the process of selling its company when much of the delayed billing occurred. However, to the extent the delay was not undue therefore impeding Defendants' ability to verify the amount billed, Defendants had an obligation to pay for gasoline received.  The Court does not find Plaintiff was acting in bad faith nor were Defendants' deprived of the fruits of the bargain.

Moreover, Defendants were required to pay all costs associated with materials to be used in re-branding the gas stations upon receipt of the invoices from Plaintiff.  Once Plaintiff is billed by BP, Plaintiff sends Defendants an invoice for materials.  As such, if BP failed to immediately bill Plaintiff for materials purchased, any invoices sent to Defendants by Plaintiff were delayed.  Thus, Plaintiff's delay in sending invoices for the branding materials was not in bad faith, Plaintiff did not deliberately hamper Defendants' ability to perform its part of the agreement, nor were Defendants deprived of any of the benefits of the Agreement solely by the delay in sending invoices.  Notably, Defendants have never disputed the invoices at issue herein. Indeed, Defendants have similarly failed to pay other invoices that were timely received.  It appears that the only party deprived of the benefits of this contract on this issue is Plaintiff who has paid for materials pursuant to the Agreement's mandate but has yet to be reimbursed by Defendants.

Based on the foregoing, Plaintiff has established, by preponderance of the evidence, its breach of contract claim with regard to both the unpaid fuel charges and the unpaid branding costs and, as such, the Court will award Plaintiff $147,577.30.

2. Attorney's Fees

Despite the general rule that litigants are responsible for their own litigation costs, the Court may award a prevailing party attorney's fees pursuant to a contractual provision. See Mahani v. Edix Media Group, 935 A.2d 242, 245 (Del. 2007); Professional Underwriters Liability Ins. Co. V. Zakrzewski, No. 03C-01-225, 2006 WL 3872847 at *2 (Del. Super. Dec. 12, 2006). If a fee-shifting provision exists, an award of fees is permissible and the Court need only determine whether the requested fees are reasonable. See Mahani, 935 A.2d at 245.

Here, Plaintiff is entitled to an award of attorney's fees based upon the provision contained in the Agreement. The Agreement provides "[i]n the event of any dispute between the parties hereto, concerning accounting for payment, prices charged, or any other matters, the costs of any proceedings, including reasonable attorney's fees incurred, shall be borne by the non-prevailing party, and reimbursed to the prevailing party." As such, Plaintiff is entitled to an award of attorney's fees as provided by the

16

Agreement.[7]

### 3. Interest

Pursuant to the Agreement, Plaintiff also seeks an award of interest on the outstanding invoices.  In Delaware, courts can use the interest rate provided by the contract entered into by the parties.  See Commonwealth Construction Co., No. 04L-10-101, 2006 WL 2901819 at *1 (Del. Super. Oct. 3, 2006)(using the contract rate of 10% to calculate a portion of the interest); Associated/ACC International, LTD. V. Dupont Flooring Systems Franchise Co., Inc., No. 99-803, 2003 WL 223446 at *2 (D. Del. Jan. 28, 2003)(finding that the Delaware statutes addressing interest were not applicable because the agreement provided that the parties agreed to interest at a rate of 18% in the agreement).  Here, Plaintiff is entitled to an award of interest at an annual rate of 18% as provided by the Agreement.  As outlined in Plaintiff's Supplemental Proposed Findings of Fact and Conclusions of Law, Plaintiff seeks $104,383.70 which represents the total amount of interest at the Agreement rate of 18% as of January 10, 2011 on all invoices. However, the Court declines to award the amount of interest sought by Plaintiff and instead awards Plaintiff $96,633.67 as of January 10, 2011 as follows[8]:

---

[7]The Court shall determine the reasonableness of the fees when Plaintiff files its formal application.

[8]Because all interest is calculated as of January 10, 2011, all dates will be rounded to the 10th in making the interest calculations.  For example, for a fuel invoice dated February 20, 2007, the Court will make any interest

A.   Fuel Invoice dated February 20, 2007 for $17,374.61: $11,988.48 in interest

B.   Fuel Invoice dated March 3, 2007 but first presented to Defendants at the end of June 2007 for $6,535.26: $4,117.21 in interest

C.   Fuel Invoice dated September 19, 2006 but first presented to Defendants in February 2007 for $17,703.73: $12,481.13 in interest

D.   Fuel Invoice dated March 1, 2007 but first presented to Defendants in August 2007 for $19,606.44: $12,057.96 in interest

E.   Fuel Invoice dated March 3, 2007 but first presented to Defendants in August 2007 for $21,250.49: $13,069.05 in interest

F.   Fuel Invoice dated March 5, 2007 but first presented to Defendants at the end of June 2007 for $7,682.45: $4,839.94 in interest

G.   Branding Invoice dated January 10, 2007 but first presented to Defendants in August 2007 for $23,699.77: $14,575.36 in interest

H.   Branding Invoice dated July 6, 2006 but first presented to Defendants at the end of July for $8,295.53: $5,101.43 in interest

_____

calculations from March 10, 2007.  Similarly, for an invoice dated March 3, 2007, the Court will make any interest calculations from March 10, 2007.

I.   Branding Invoice dated January 10, 2007 but first presented to Defendants in August 2007 for $34,801.80: $21,403.11 in interest

B. Defendants' Counterclaim

Based on the applicable law set forth previously herein, the Court finds that Defendants have failed to prove, by a preponderance of the evidence, that Plaintiff breached the Agreement, or the implied covenant of good faith and fair dealing, due to Defendants' failure to receive the branding incentives, gas rebates and reimbursement for the Monridge Construction invoices.

First, with regard to the gas rebates and branding incentives, the Agreement provides that Defendants would receive the incentive money and rebates from BP.[9]  Further, the parties have stipulated that "if the Defendants met the image requirements as established by BP as the national franchise whose "brand" the [D]efendants were to represent, Branding Incentives would entitle the Defendants to $30,000 for each of the two stations being re-branded and a $.02 cent per gallon rebate of all gallons of gasoline sold during the

---

[9] Mr. Kohli acknowledges that the Addendum to the Agreement expressly indicates that he would receive the incentives from BP and initialed the Agreement to verify his understanding, however, he urges the Court to find that it was his understanding that this Agreement would be similar to his past agreements with Plaintiff where he received signing bonuses directly from Plaintiff.  The Court finds no need to deviate from the express wording contained in the Agreement.  Nor will the Court consider issues of custom and usage as the Court finds that Defendants' past agreements with Plaintiff are irrelevant since the testimony and evidence firmly establish that by way of this Agreement Plaintiff and Defendants were entering into an entirely different business arrangement.

first 36 months of the agreement."[10]   Here, Defendants have failed to show that they met BP's image requirements, as such, they were not entitled to receive the branding incentives or gas rebates from BP.

As a preliminary matter, the Agreement not only outlines which party would be responsible for branding materials versus labor costs, it also provides that Defendants were ultimately responsible for full branding of the stations. On the other hand, because only Plaintiff could order branding materials and agreed to provide labor to install branding materials it is clear that Defendants had to rely on Plaintiff to achieve branding. It is this reliance on Plaintiff for branding that Defendants base their claim for breach of the covenant of good faith and fair dealing. However, the testimony and evidence before the Court establishes that Plaintiff was unable to complete certain aspects of the conversion-i.e. the BP logos-due to Defendants' dispute with another company regarding new gas pumps being installed at their stations.  Because of the dispute, Defendants would not tender the remaining balance for the new gas pumps and the company supplying the gas pumps would not provide Defendants with the remainder of the parts.  One part the

---

[10] This stipulation obviates any discussion on custom and usage before the parties as it is now clear that the incentives and rebates would not be paid until Defendants met BP's imaging requirements.  Thus, Defendants acknowledge that unlike past agreements with Plaintiff where they received incentive money as a "signing bonus" from Plaintiff, BP has different requirements and does not provide said incentives or rebates until their image requirements are met.

company failed to supply was the valances for the gas pumps. Indeed, the withheld parts were the very parts necessary for installation of the BP logos therefore impeding Plaintiff's ability to complete the branding.

Further, the testimony establishes that Defendants were informed numerous times by at least two individuals employed by Plaintiff of the branding deficiencies that existed at the stations and what items would have to be completed to qualify for the branding monies. Additionally, Plaintiff had a specific employee working with Defendants to ensure Defendants would become fully branded. The testimony also establishes that Plaintiff would not benefit in any way by Defendants' failure to become fully branded. Thus, to the extent Defendants' dispute with another supplier interfered with Plaintiff's ability to complete the branding, Defendants cannot now seek to hold Plaintiff accountable for its own interference in the process. As such, Defendants have failed to prove that Plaintiff has breached the Agreement, or the implied duty of good faith and fair dealing.[11]

Even if the Court were to find that Defendants were unaware of BP's exact branding requirements, which it does not, the testimony establishes that some of the deficiencies were so obvious that

---

[11] Indeed, this analysis was merely an exercise in futility because even if Plaintiff breached the Agreement or the implied covenant of good faith and fair dealing due to Defendants' failure to become fully branded, Defendants were de-branded for commingling gasoline. Thus, if Defendants had received the branding incentives and rebates, Defendants would have been deemed responsible for repaying all incentives monies received from BP.

Defendants, with their 24 year history in the gas station industry, can not reasonably plead ignorance.  For example, Defendants failed to complete the installation of the BP Helios present at every BP operated gas station.  Defendants cannot reasonably proffer that they were unaware of the need for the very signage necessary to identify their gas station as BP.

Similarly, Defendants have not proven, by a preponderance of the evidence, that they were entitled to reimbursement for the Monridge invoices as a labor cost because it was not labor associated with the branding of the gas stations.  The Agreement provides that Plaintiff shall supply all labor to install the branding materials.  Here, the Court finds that the work done by Monridge on the underground piping, the concrete/blacktop and installing and replacing pumps was not branding specific work.  Not only was this project initiated before the branding process began, Defendants continue to utilize the equipment installed by Monridge at its existing stations unlike any BP branding materials which have been removed.  Further, Defendants did not present the Monridge invoices until this litigation was initiated by Plaintiff, thus, calling into question whether they truly expected to be reimbursed by Plaintiff for this work.  Accordingly, based on the evidence and testimony before the Court, Defendants have not shown by a preponderance of the evidence that Plaintiff has breached the Agreement with regard to the Monridge invoices.

22

## III.   CONCLUSION

Based on the foregoing, and for all the reasons discussed herein, the Court finds in favor of Plaintiff on its breach of contract claim and will enter judgment in Plaintiff's favor and against Defendants for $147,577.30 and interest in the amount of $96,633.67 for a total amount of $244,210.97.  Attorney fees shall be determined upon the filing of Plaintiff's formal application.

The Court further finds in favor of Plaintiff and against Defendants on Defendants' counterclaim.  Plaintiff is not responsible for reimbursing Defendants' for their failure to receive the branding incentives and gas rebates nor is Plaintiff responsible for the Monridge Invoices.  A judgment consistent with this Memorandum of Decision will be entered.

s/ Karen M. Williams
KAREN M. WILLIAMS
UNITED STATES MAGISTRATE JUDGE
